THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT.
OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL
COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90
DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE
DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER
THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU
ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY
DOCUMENT FILED WITH THE COURT.

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3
   MILDRED COLLINS-WILLIAMS,      )
 4 ET AL                          )
                                  )
 5      PLAINTIFFS,               )
                                  ) DOCKET NO. 1:20-CV-03129-CAP
 6      -VS-                      )
                                  )
 7 CONTOUR EASTWYCK, LLC.         )
                                  )
 8      DEFENDANT,                )
                                  )
 9      -AND-                     )
                                  )
10 DEKALB COUNTY POLICE           )
   DEPARTMENT,                    )
11                                )
        OBJECTOR.                 )
12
                  TRANSCRIPT OF MOTION PROCEEDINGS
13             BEFORE THE HONORABLE CHARLES A. PANNELL
                    UNITED STATES DISTRICT JUDGE
14                        AUGUST 11, 2021

15 APPEARANCES:

16 ON BEHALF OF THE PLAINTIFF:

17      MICHAEL RAFI, ESQ.
        ALEXANDER BROWN, ESQ.
18      RAFI LAW FIRM

19 ON BEHALF OF THE DEFENDANT:

20      CHRISTOPHER JOEL PERNICIARO, ESQ.
        GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP.
21

22 STENOGRAPHICALLY RECORDED BY:

23                  PENNY PRITTY COUDRIET, RMR, CRR
                       OFFICIAL COURT REPORTER
24                  UNITED STATES DISTRICT COURT
                         ATLANTA, GEORGIA
25
```

```
 1            (PROCEEDINGS HELD IN OPEN COURT AT 2:08 P.M., ATLANTA)

 2            THE COURT:  Case 20-CV-3129, Mildred Collins-Williams

 3  and others v. Contour Eastwyck, LLC, set down today for a motion

 4  hearing.

 5            Tell me who is here on behalf of the plaintiff.

 6            MR. RAFI:  Judge, my name is Michael Rafi.

 7            THE COURT:  You're going to have to take your mask down.

 8            MR. RAFI:  Yes, sir.

 9            Judge, my name is Michael Rafi, R-A-F-I.

10            MR. BROWN:  Alex Brown.

11            THE COURT:  When you're speaking into the microphone,

12  you can take your mask down.

13            MR. BROWN:  Yes, your Honor.

14            THE COURT:  And who is here on behalf of Contour

15  Eastwyck?

16            MR. PERNICIARO:  Good afternoon, your Honor.  Chris

17  Perniciaro on behalf of Contour Eastwyck.  I'll repeat the last

18  name, Perniciaro.  Do you need me to spell that?  It should be on

19  the pleadings.

20            THE COURT:  Have you got a microphone?

21            MR. PERNICIARO:  Can you hear me better now?

22            THE COURT:  Yes.  Okay.  You can pull it towards you.

23            All right.  Let's see.  I think we're here on a motion

24  filed by the plaintiff.  Tell me why we're here and what it is

25  that you're having problems with, as if I didn't know.
```

1            MR. RAFI:  Judge, we are here to get stuff, to get a

2     whole lot of stuff.  And I'm going to talk through it.  If you

3     wouldn't mind me scooting over here.

4            I hope to explain to you the three problems that we're

5     having and the solutions that we think to those problems and why

6     they make sense.

7            So the three problems that we have are:  What should be

8     searched?  We're here about electronically-stored information and

9     e-mails, so the first issue or problem is what should be searched.

10           The second problem is:  Who should perform that search?

11           And the third issue or problem is:  What should be

12    produced after the search?  What documents do we have a right to

13    as the plaintiff that are coming from the defense?

14           The plaintiffs' global concern now after 11 months of

15    litigation is that we cannot trust the defendant and we cannot

16    trust what they tell us, and that's how we got here.  We've gotten

17    here because we've been spinning our wheels asking a whole lot of

18    questions and trying to figure out what the heck is going on.

19    And, honestly, we still don't know some of that.  So I plan to

20    tell you what we know and what we need to know.

21           Most of the information we have has been self-reported

22    by the defendant, Contour; meaning, they've told us what the

23    information is.  Unfortunately, repeatedly, the information they

24    have provided us has not been accurate.  In fact, it's been

25    completely untrue.  And we'll go through some examples, Judge.

1          So we are here -- to answer your first question, we are

2   here and what's going on is we can't trust what we're being told,

3   so we need to find it either ourselves or through a neutral third

4   party.

5          THE COURT:  All right.  Now, all this centers on a

6   search of e-mails?

7          MR. RAFI:  Yes, Judge.

8          THE COURT:  Okay.

9          MR. RAFI:  So there are three areas that we believe

10  should be searched.  The first is what's apparently called

11  Contour's backup domain database, their backup domain database.

12  That's where I'm going to start.  The other two that we'll speak

13  about are Gmails, Google e-mail accounts.  And then the third one

14  is e-mails through GoDaddy, which is an Internet service provider

15  that allows you to have a website and have e-mails.

16         I'll start with the domain backup system.  In April of

17  this year the defendant's corporate representative testified that

18  they had a domain backup system.  She called it, quote, the backup

19  domain database.  Since then we've been trying to figure out what

20  the backup domain database is, what's in it, where is it stored,

21  who has access to it, what e-mails or anything is saved there, and

22  what the date range of things that are saved there is.  Since

23  then, though, the story has changed.

24         In July of this year, so last month, actually on

25  July 23rd of last month, Contour, the same representative, said

1  under oath in a different case -- there's a pending case against

2  Contour for a similar shooting that happened after ours in the

3  State Court of Gwinnett County.  And in that case discovery's

4  ongoing, just like it is in this one.  And Contour provided the

5  same corporate representative to testify in that case, except in

6  that case Contour says e-mails are not backed up.

7          And, Judge, we've provided you with some exhibits.

8  There's also a binder on your desk.  If you look at the first tab,

9  and I'm not going to read -- I assured your staff that I will not

10  read everything that is in this binder, I promise.  But the first

11  page -- it's actually four pages, but at the bottom right page the

12  question was:  Are those e-mails backed up?  And that's line 25,

13  page 119 in the top right quadrant.

14          The answer, which goes from 119 to page 120 was:

15  They're backed up on our database, correct, on our domain

16  databases.

17          We asked:  Your what?

18          And they said:  Our domain database.

19          So in April there was a domain database.

20          Judge, if you go to the second tab in that binder, this

21  is the testimony from the same corporate representative in the

22  case that's going on in Gwinnett County.  And the testimony there

23  was -- it's actually the second page, forgive me.

24          The question is, line 16, on page 138, or 113:  In

25  regards to your Internet and -- and e-mail systems, storing,

```
1  keeping -- backing up your e-mail system?
2          The answer is:  Our e-mails aren't backed up.
3          So that's the same corporate representative for
4  defendant saying two very, very different things about two, three
5  months apart.
6          And then we look to what the parties in this case came
7  to, the joint notice of compliance with the Court's order where we
8  were supposed to come up with a protocol, your Honor, which the
9  parties did our best.
10          On page four of that order, Contour agreed to search the
11  "backup domain database."  We're here about the backup domain
12  databases because we don't know if it even exists because Contour
13  says one thing in one case and one thing -- a very different thing
14  in another case.  So we don't know how we're supposed to search a
15  backup domain database that in our case apparently has e-mails but
16  in the Gwinnett County case, which is called *Mayes*, the *Mayes* case
17  it does not.
18          Moving away from the domain database, the next issue is
19  about e-mails.  In order to search for e-mails we need to know two
20  things:  What e-mails are out there, what e-mails have existed;
21  and whether those e-mail accounts can now be searched.
22          So we need to know what the universe of information is,
23  and then can we get to that information.  And this too has been a
24  moving target within our case and when compared to the *Mayes* case
25  in Gwinnett County.
```

 1            Like any company, Contour employees were assigned e-mail

 2   accounts.  So the starting point to this analysis is who were all

 3   the employees?  We need to know the employees so we can find out

 4   what their e-mails were.

 5            In September of last year when this lawsuit began, when

 6   discovery began, Contour said that they had 13 employees.  We had

 7   no reason to dispute that, we thought that was true.  On the last

 8   day that discovery was supposed to expire, so the last day of

 9   original discovery in this case, which was in February of this

10   year, Contour told us about 20 total employees, so they added

11   seven.  Since February, so for the last five months, we have

12   operated that there have been 20 employees.

13            Last Thursday, five days ago, six days ago, whatever it

14   is, we found out about 42 extra employees.  The way we found that

15   out is that the discovery in the *Mayes* Gwinnett County case was

16   given to us by the plaintiff in that case, there was no protective

17   order, we were able to share information.  And we got more than

18   1,000 pages of personnel files, for a total of 62 employees.  That

19   would mean for the entire part of this case up until last

20   Thursday, we didn't know about two-thirds of the employees.

21            And the reason there's this star next to 62 is because

22   we actually knew about two of the employees, Ashelynn Burt Jones

23   and Jori Jones.  We knew about them because the documents that

24   Contour had provided us through discovery mentioned them.  Except

25   for the entire case, and even until now, Contour has claimed to us

1  in this case, in Federal Court, that those two people were never,

2  ever employees, that they had no record of those people, and that

3  those people never worked there.

4         The truth is, as shown by the *Mayes* production, which we

5  received a copy of on Thursday, and we provided the Court at least

6  most of this information in a briefing we filed yesterday, the

7  truth is that those employees not only work there, but Contour had

8  their employee files the entire time.

9         So our world, our universe of who the employees are have

10  grown from 13 to 20, now to 62.  And to make sure that I'm clear

11  here, Contour didn't come clean and tell us about the 62

12  employees, we found out about them through our own due diligence

13  and digging in this Gwinnett County case.  To date in this case

14  Contour has never told us about 42 employees, even though they

15  have personnel files for all of them.

16         Judge, you will see in tab three of your binder two

17  e-mails.  The e-mails are between -- one e-mail is between Dian

18  Pauleon and Latasha Dia.  That's the one with the big Contour logo

19  on it.

20         THE COURT:  You're saying tab two?

21         MR. RAFI:  Yes, Judge.  In tab three, I'm sorry, you

22  should have two e-mails.

23         THE COURT:  Okay.

24         MR. RAFI:  After you get through all those pages, we're

25  not going to read.

1          So the first e-mail, or at least one of the e-mails,

2    should have this logo, Judge, this very large logo right in the

3    middle (indicating).

4          If you look down at the bottom two highlights, you can

5    see that the "from" on that e-mail is from Jennifer Bentley.  And

6    her e-mail account is jennifer.eastwyck@gmail.com.  And then below

7    in the bold it says "Jennifer Bentley, Resident Coordinator," so

8    she works for Contour.

9          In this other e-mail with the smaller Contour logo, at

10   the top that e-mail is from Ms. Pauleon, who is a Contour

11   employee, to Britknie, B-R-I-T-K-N-I-E, Bush.  And Ms. Bush's

12   e-mail is Britknie, spelled the way I just spelt it, dot, eastwyck

13   @gmail.com.

14         So from these two documents that Contour produced -- the

15   defendant gave us these e-mails.  You can even see one of the

16   Bates Stamped in one of the e-mails, one of the Bates numbers.  We

17   know that there are these two e-mail accounts out there.  The

18   problem is if you go to page five of the parties' joint order,

19   Judge, which was submitted by the parties pursuant to your order

20   to come up with a protocol, Contour claims the following:

21         Defendant is only aware of one Gmail account used by

22   leasing office employees.  Well, here are two.  Those two e-mails

23   that we have, Judge, in tab three, both of those are leasing

24   office employees, jennifer.eastwyck and britknie.eastwyck, those

25   were leasing office employees.  So Contour, who gave us those

1  e-mails, knows about those two Gmail accounts for their employees.
2  The Gmail that Contour admits it knows about is called
3  eastwyckvillages@gmail.com.
4          So to summarize, we know of three e-mail accounts that
5  are used through the Gmail platform by Contour.  We know about the
6  three because Contour has provided us documents that show --
7  internal Contour documents that show communication with these two
8  e-mail accounts, these two right here, but Contour is pretending
9  they don't exist and will not acknowledge that they're real
10 e-mails that their own employees used.  This is the problem we're
11 having about why we can't trust what Contour is saying because the
12 words on the page say something very different than what Contour
13 tells us.
14          I mentioned that there's a third e-mail account and
15 that's eastwyckvillages@gmail.com.  This, as far as we know, is
16 the leasing office e-mail.  So if you and I lived at Contour at
17 this property and we needed to get a hold of the leasing office,
18 we could e-mail this e-mail and it would go presumably to the
19 leasing office staff.  It's their main e-mail.  At my law firm
20 it's infor@, my law firm, dot, com, it's one of those.
21          We've been told a lot of different things about this
22 e-mail because this e-mail is presumably very important.  It has
23 all of the leasing office communication with residents, with
24 staff, with other members.  And here's what we've been told:
25          First, that Contour lost access to the e-mail in the

1   summer of 2020.  That didn't make sense because Contour was still

2   operating the property.  They've since sold it, but in the summer

3   of 2020 and the fall of 2020 and winter of 2020 into 2021 Contour

4   still owned and operated the property.  So it never made sense to

5   us that they just magically lost access to their main e-mail

6   account while they're operating the property.  Well, come to find

7   out, that statement wasn't true.  And that was filed in a pleading

8   with this court.

9           The next story was that Contour lost access to the

10  e-mail when they sold the property in January of this year.  We

11  said, why did you lose access to a Gmail account when you sold the

12  property?  When you sell property, an e-mail account usually

13  doesn't go with it.  And their response is two things:

14          First, that e-mail account is accessible through the

15  leasing office computer, and we don't have the leasing office

16  computer anymore.  That didn't make a ton of sense because you can

17  access Gmail accounts from anywhere.  I can log into your Honor's

18  computer and access my Gmail account right now, if I knew the

19  password.  I'm usually guilty of not knowing my passwords.

20          The second reason that didn't make sense is because we

21  said, well, if you sold the e-mail with the property that has to

22  be in the sales agreement, can we see the sales agreement?  We

23  still have not been provided the sales agreement, although we've

24  been told that this e-mail is not mentioned in the sales

25  agreement.  We have to rely on Contour's word for that because

1 they refuse to give us the sales agreement.  So then we know that

2 they had access in January and we know it wasn't sold with the

3 property.

4          So the next story we heard was that Nirvana, who is the

5 new owner of this property, that Nirvana is using it.  Well, a

6 quick search of Nirvana's website and a quick call over there,

7 we've determined they're not using that e-mail account, they have

8 their own.  They've renamed the property to nirvana@candlerroad,

9 not eastwyckvillages.  So it makes no sense for Nirvana to use

10 eastwyckvillages.com.

11          So the next story we heard was, well, we don't know if

12 the real owner is really using it, we presume they are, but we

13 can't access the e-mail account because we don't know the

14 password, which begs the question of, well, did you try the old

15 password and did it work?  What passwords did you use?  But to

16 date the defendants refuse to tell us what any of the passwords

17 were.  They just tell us the password has been changed.  You can't

18 change a Gmail password without knowing the old password.  So that

19 would mean if the password has changed, someone with the defense,

20 the defendant, has given the password to the new owner who has now

21 changed it, but that doesn't make sense because the new owner

22 isn't using the e-mail, or someone at Contour changed it.

23          So when you don't know your password, if you're like me,

24 you go to the "forgot my password" feature, click the little

25 button that says I forgot my password, and then you go through the

1  prompts where you get a recovery e-mail.  So we said to Contour,

2  well, did you try to recover your password?  And they said, no,

3  because that would be hacking, we would be hacking that e-mail

4  account because we sold it when we sold the property.  But we know

5  they didn't sell it with the property.  And around and around and

6  around we've gone for the last nine months about this e-mail

7  account.

8          Most recently in the Gwinnett County case the corporate

9  representative was asked:  Did you search the Gmail account?

10         And the testimony reads as follows.  The question was:

11 Who searched that e-mail account for -- in preparation to get you

12 ready for today's deposition?  So who searched the e-mail account.

13         The answer by the corporate representative:  I do not

14 believe it was searched.

15         The question:  Any particular why it wasn't searched?

16         The answer:  No, I don't -- I don't know why it wasn't

17 searched.

18         The corporate representative isn't sitting there saying

19 three weeks ago, on July 23rd, we didn't search it because we

20 don't have the password, she's just saying, well, I don't know, we

21 haven't searched it.  The problem here is we don't know if Contour

22 has even tried to access this e-mail account because they refuse

23 to tell us.

24         So this is what we need to know about the Gmail

25 accounts, this is why we're here, to find out this information so

1   we can create a thorough and reliable protocol so that we can all

2   trust the results.

3        First we need to know what accounts existed, what e-mail

4   accounts were there.

5        The second thing we need to know is what can defendant

6   access, what e-mail accounts can they actually get inside of to

7   get e-mails from?

8        And then the third thing is if there are e-mail accounts

9   they cannot access, why can't you access them and when did you

10  lose access?  We need to know what they had, what they still have

11  and what they don't have and why.

12       There's a third set of electronically-stored information

13  which is tied to GoDaddy or Microsoft accounts.  GoDaddy is a

14  platform where you can buy e-mail accounts.  And we need to know,

15  similar to the Gmail accounts, what existed and what defendant can

16  access.

17       I apologize in advance for this technical summary, but I

18  think it is very important, so forgive me.  GoDaddy is a platform

19  where companies can have e-mail accounts through Microsoft.

20  Contour is a group of companies.  There is Contour Companies,

21  Contour Development, there's Contour Eastwyck, Contour Old Villas.

22  There's countless Contour entities.  All of those Contour entities

23  have one GoDaddy account it appears.  Again, this is based on what

24  we've been told.

25       So GoDaddy has a database or a dashboard for customers.

 1   And in that dashboard you can see all of your accounts.  When

 2   someone wants to buy an e-mail account with GoDaddy, you actually

 3   buy a license.  That license allows you to assign an e-mail

 4   account.  So, for example, in my office where we use this same

 5   platform, I buy a license to have an e-mail account, and then I

 6   assign it to Alex Brown, I assign it to myself.  Those licenses,

 7   those licenses can be used for multiple e-mail accounts and they

 8   can be renamed.  So, God forbid, Alex Brown ever leaves my law

 9   firm and somebody else is sitting there, I can change Alex Brown's

10   e-mail to that new person's e-mail account.

11           So GoDaddy calls this process aliases.  When you want to

12   change the e-mail address tied to a license, you create an alias.

13   For example, the first person that I ever hired at my firm, her

14   name is Audrey, and she's now a lawyer but I had hired her as a

15   paralegal.  Audrey's e-mail in my firm has become Britney, then it

16   became Chris and now it's Casey, because that one license has been

17   renamed multiple times.  So right now if I want to find Audrey's

18   e-mails from 2015, I can go on Casey's e-mail, scroll all the way

19   back and I can find Audrey's 2015 e-mails because when I create an

20   alias and when you create an alias on a GoDaddy platform, all it

21   does is rename the e-mail account.  So when I send an e-mail, it

22   will go to that same account.

23           So what we're trying to figure out from Contour is what

24   are all of the e-mail accounts, the e-mail addresses that they've

25   ever had tied to these licenses that they have.

1          We know from testimony that Contour employees used
2    multiple e-mails.  Some of them had multiple e-mail addresses.  We
3    also know that Contour used different domain names.  When I say
4    "domain name," I mean the "at" whatever.  So Contour used e-mail
5    addresses that were @contourcompanies; @contourdevelopmentgroup,
6    and possibly "at" other Contour entities.  And all of these are
7    co-mingled in one big GoDaddy account.

8          Here's an example from Contour.  Bradley Payne was a
9    leasing manager at Contour.  When this lawsuit started, Contour
10   told us that Bradley Payne was employed and the manager at the
11   time of the shooting.  We've actually since learned that Bradley
12   Payne was not employed at the time of the shooting, he had been
13   terminated months earlier, yet for six months Contour told us that
14   Bradley Payne was the manager in charge.  In fact, to date we
15   still do not know who the manager in charge was at the time of the
16   shooting, we just know for certain it wasn't Bradley Payne.

17         Mr. Payne was -- Mr. Payne was replaced by someone named
18   Dian.  It's very possible that Bradley's e-mail became Dian's
19   e-mail, and that Dian's e-mail has become someone else's e-mail.
20   Essentially, one license was used for multiple e-mail addresses
21   and that one license has all the e-mails for all these people.

22         Here's what we need to know:  We need to know how many
23   licenses Contour has, we need to know all of the e-mail addresses
24   and aliases that are tied and have ever been tied to those
25   licenses; we need to know if those e-mails can be accessed and, if

1  not, we need to know why they can't be accessed and what Contour

2  has done to try to access them.

3        There are two potential solutions.  The first solution

4  is Contour can continue to self-report.  That hasn't worked to

5  this point, that's why we're here and we know Contour has not been

6  truthful.  That is a very bad solution.

7        The more appropriate solution here, where a forensic

8  examination has already been granted, but the more reasonable

9  solution is to have a forensic examiner analyze Contour's GoDaddy

10  account to determine what we need to know; what are the licenses,

11  what are the aliases, what are the addresses, and what can be

12  accessed and what can't.  And that's because we can't trust what

13  Contour has been telling us themselves.  If we went by Contour's

14  word, we would only know about 20 employees and not know about 42

15  other ones, who all, presumably, have e-mail addresses.

16        THE COURT:  Just leave it a minute.

17        MR. RAFI:  Yes, Judge.  If you can't read my

18  handwriting, I'm happy to read it out loud for you.

19        THE COURT:  Go ahead.

20        MR. RAFI:  Thank you, Judge.

21        We also would like to know account changes.  So if

22  something has been deleted or something has been changed, we need

23  to know when that happened and when the change was.

24        To preview what I imagine will be coming down the

25  pipeline one day when we have this information, there may be

1    issues of preservation of evidence and spoliation, we don't know

2    enough to present the Court with that information, that's partly

3    what we're trying to figure out here, so we need to know about

4    account changes.

5              The second problem that we're trying to address here is

6    who should perform this search.  If there is a forensic search,

7    which the Court has said there should be, who is going to perform

8    it?  And there's two possible solutions here.  Defendant wants to

9    use their own expert.  They think an expert that they have already

10   hired in this case, that they've already paid in this case that

11   plaintiff has no access to, that that's the person that should run

12   the search.  We do not think that.  We think that literally anyone

13   but defendant's expert should run the search, anyone.  We have no

14   preference of who the vendor is, we just don't think it should be

15   someone that was hired already and paid by the defendant, it

16   should be somebody who is truly neutral.

17             And the very last issue is what should be produced.  We

18   believe that if an e-mail is discovered by searching the e-mail

19   accounts using the search terms that the parties have agreed to,

20   if an e-mail comes back and if it's not privileged, we should get

21   it.  In other words, we should receive all nonprivileged

22   responsive e-mails.  We don't want the privileged e-mails, we just

23   want the things that are essentially hits that come back from the

24   search.

25             Contour wants to be able to object.  They want to be

```
 1  able to lodge objections to e-mails that are responsive, meaning
 2  they come back from the search and they're hits, and e-mails that
 3  are not privileged.  I can't think of any reason Contour would
 4  have a legitimate objection.  The process here would be that
 5  Contour gets an e-mail from this search, the forensic examiner
 6  says, here, Contour, here's an e-mail, it came back from the
 7  search, it's responsive.  Contour reads it and says, this is not
 8  privileged, but we're going to object because it is -- I don't
 9  know, it's unduly burdensome.  No, it's right here in their hand.
10  It's not proportional to the needs of the case.  No, it's right
11  here in their hands.  We're not sure what objections Contour plans
12  to make, but what this will create is a problem for moving this
13  case.
14         Consider this, Judge:  If there's 1,000 e-mails
15  produced -- excuse me, if there's 1,000 e-mails that come back
16  from the search, Contour can say to us, here's 800 of them, 100 of
17  them are privileged, we're not going to give you those but we'll
18  give you a privilege log, that's fine for us, but these other 100,
19  we're objecting to them on whatever grounds, and we're not going
20  to tell you what the e-mails say, we're not going to tell you
21  anything about the e-mails other than they're objectionable.  And
22  what that is going to cause is us back here in this room with all
23  of you because we're going to have to file a motion to compel
24  because we won't know whether we have a right to these e-mails.
25  And then there likely will have to be an in-camera inspection
```

1  where, Judge, you decide.  And that takes time, resources and it

2  just makes no sense.  So we believe the simplest, most fair

3  solution is that all responsive, nonprivileged e-mails are

4  produced to us.

5         The last thing I'll say, your Honor, is that we have

6  spent hundreds and hundreds and hundreds of hours.  I want to say

7  a thousand, but I'm not confident in that, but I can tell you

8  we've spent hundreds, multiples of hundreds of hours on this

9  issue.  And we've essentially gotten nowhere.  We've gotten a lot

10 of information that contradicts itself.  We have a lot of

11 information that we know isn't true or doesn't make sense, but

12 we're here for help because we need to move this case.  Our client

13 deserves that.  And we can't get anywhere.

14        We know now we're going to have to go -- we need more

15 time for discovery, but this will be another issue we'll address

16 with you at another time, Judge.  We now, for example, know we

17 need to go find 42 more people, and we have no discovery time to

18 do that as of right now, although it's delayed.  So we are --

19 although we're almost a year into this case, because of Contour's

20 untruthfulness, because of their unwillingness to share basic

21 information, and because of the misinformation we've been given,

22 we're at step one.  And that's extremely frustrating and pretty

23 disappointing to our client.  Thank you.

24        THE COURT:  All right.  What does the defense say about

25 all this?

 1          MR. PERNICIARO:  Well, I have a lot to say, your Honor,

 2   because a lot was just said.

 3          I want to start off by saying that we have tried to

 4   agree with plaintiffs' counsel on a lot of these issues.

 5          I'm sorry.  Can you hear me, your Honor?

 6          THE COURT:  Yes.

 7          MR. PERNICIARO:  We've tried to agree with the

 8   plaintiffs on this issue.  Unfortunately this whole process got

 9   started because they would rather go off and file a motion to

10   compel rather than work with us and provide some sort of

11   parameters for the search of the ESI materials.

12          This was supposed to start with a set of keywords that

13   Contour would take and search their e-mail accounts.  And we asked

14   what keywords the plaintiffs wanted us to search.  They refused to

15   give them to us until they filed a motion.  We found out about the

16   keywords when they filed their motion, and then the process got

17   going from there.

18          But as soon as we received the request to do the ESI

19   search, we immediately agreed, like actually after the corporate

20   representative's deposition we agreed to do the search.  So it's

21   all been a question about parameters and a bunch of technical

22   information that, unfortunately, the corporate representative's

23   depositions, the transcripts that you were provided, your Honor,

24   Ms. Prekelezaj, she's not a technical person.  This is a family

25   company and she doesn't understand what the difference is between

1  a domain and a backup system and GoDaddy accounts because, in

2  reality, it's all the same thing, it's all the same thing.  So

3  we've tried to agree.

4           And we've actually agreed to do exactly what the

5  plaintiffs asked us to do, but they refuse to withdraw their

6  motion because they want more information and every e-mail that I

7  send with information is met with three e-mails in response that

8  are unsolicited, twelve questions to every one answer I give.

9           I want to start off with some of the things that were

10 said about the employees that supposedly were disclosed in another

11 case.  I just found out about that yesterday in a reply brief --

12 or in their motion.  So for them to come in here and start arguing

13 about that I think is unfair because I haven't even had a chance

14 to talk to my client about it.  As far as I know, they produced

15 that voluntarily in the other case and they were going to give

16 that to me and I was going to produce it the next day and then it

17 wouldn't have been an issue if they hadn't filed their motion yet.

18 So, of course, nobody is trying to hide any information.

19           THE COURT:  Well, it is an issue because you haven't

20 turned it over to them earlier or your client hasn't.

21           MR. PERNICIARO:  Your Honor, they've conducted a search

22 and they have payroll records in their company headquarters in

23 Michigan.  There's a single employee that runs the HR department,

24 and she ran a search of employees that were supposedly employed at

25 that property.  If she made some sort of technical error when she

1    ran that search, that's a problem.  It doesn't make --

2             THE COURT:  Oh, yeah, it's going to be a real problem.

3             MR. PERNICIARO:  Yes, I understand.  I understand that.

4    But as far as if -- they're making it seem like it was

5    intentional, which there's no evidence of it being intentional.

6    And that's an issue I think that we need some opportunity to

7    investigate because it was just -- it was just yesterday.

8             So as far as the costs go, we offered to do the search

9    of the accounts that we identified and that the Court ordered us

10   to search, we offered to do that.  We were asked to use a company

11   that we had hired that did something very neutral, that just

12   simply downloaded data from a cell phone, the cell phone of the

13   decedent in this case, and provided the data to everybody.  We

14   didn't get the data before they did, they got the data at the same

15   time as we did.  And the reason we agreed to use that service and

16   pay for it is because it's a reliable company.  They're called

17   Relevant Data Technology Services.  We've used them previously and

18   know that they'll control costs.

19            So the reason I mention that is because controlling

20   costs is important.  And what they're asking the Court to do

21   doesn't -- it doesn't relate to -- it doesn't jive with what the

22   law is.  The law requires that under Rule 34, the costs have to be

23   controlled.  And if a neutral forensic examiner is appointed, then

24   the plaintiffs should bear those costs unless there's some sort of

25   extraordinary circumstances.  I don't think that those are

1    appropriate in this case.

2            We cited the *Ford* case in our response brief, and that

3    talks about how the Court should control the costs if a forensic

4    examiner, an objective neutral forensic examiner, was appointed,

5    so that's what we were asking be done.

6            I spoke with the forensic examiner that the plaintiffs

7    proposed.  His name is Chase Richie, your Honor, I spoke with him.

8    He seemed like a very competent individual.  But when I asked him

9    about cost, and I explained to him what was proposed to be done,

10   he talked about a number that seemed to greatly exceed what we

11   would have to pay this Relevant Data Company.  So, again, if the

12   plaintiffs want to use him and pay for him, then that's fine, we

13   have no problem with that.

14           So as far as the accounts go, your Honor, the company

15   used GoDaddy as their backup domain service provider.  And what

16   that means, if it wasn't apparent from Mr. Rafi's presentation,

17   they access the e-mail accounts through Microsoft Outlook 365.

18   Those e-mails are backed up to a third-party company, GoDaddy.

19   GoDaddy has servers wherever their headquarters is.  There is no

20   Contour server.  And that's the confusion that Ms. Prekelezaj had,

21   is she didn't understand the difference between their domain and

22   their backup and GoDaddy, but in reality they're all the same

23   thing.  So the e-mail accounts are backed up to those accounts.

24           We've identified four accounts that are still active.

25   And we've already agreed to search them.  They've already been

1    searched by the owners.  And we understand that there have been

2    some inconsistencies that arose, which is why we agreed to use the

3    forensic examiner.  Straightforward, no disagreement on that.

4            The other remaining accounts that they would like to

5    search, there are a list of employees that have had accounts

6    there.  The accounts were only given to managers, which is the

7    testimony in the case.  They were not given to every single

8    employee who worked there.  So the managers had the accounts.

9            When the managers were terminated, their accounts would

10   also be terminated as well.  And we have the -- some evidence to

11   back that up.  Before the incident even happened, which is in

12   April of 2019, there were two managers that were terminated,

13   Bradley Payne and Antoinette Narcisse.  Both of these employees

14   when they were terminated and left their employment with my

15   client, their accounts were terminated with GoDaddy and the

16   accounts were deleted because GoDaddy doesn't store information

17   for free, it costs money.  So the client decided, it was a

18   business decision, to terminate those accounts.  So that's before

19   any reason to think that litigation would arise because that was

20   before the shooting even happened.

21           And then, of course, there's another manager that was

22   the manager around the time of the incident, and her account was

23   deleted after but it was done in the same manner as the other two.

24   So those are accounts which we've already sworn under oath do not

25   exist and they're not accessible.  So those are the GoDaddy

1  accounts, your Honor.  There should be no dispute about searching

2  the GoDaddy accounts.

3       The Gmail accounts, the client has said that they tried

4  to access the Gmail account for the leasing office, which is --

5  the name was provided, and I don't have it in front of me, but it

6  was in an e-mail that was presented to the Court.  I apologize.

7  eastwyckvillages@gmail.com.  That is the Gmail account that was

8  associated with the leasing office, which your Honor ordered to be

9  searched.  My client tried to search it.  They said that the

10  password that they had for it did not work.  The property had been

11  sold at that time.  They said that they assumed that the password

12  did not work because the current company is using it that owns the

13  property now.

14       Now, Mr. Rafi said that that's not true.  And he says

15  it's not true because he called the company and he looked on their

16  website.  I haven't talked to the current owner, I don't know, but

17  I know that I proposed to the plaintiff that we send them a joint

18  subpoena and ask for access to that Gmail account.  We want to

19  search that Gmail account.  We think it should be searched, we

20  just don't have access to it, or at least the client does not.

21       They're not comfortable with trying to use the feature

22  that they referenced about trying to reset the password or find

23  their password.  We would like to get permission from the current

24  property owner to do that.  And that's what we ask that we be

25  allowed to do and that we jointly try to do that because we think

1  it's reasonable to do.

2        The remainder of the Gmail accounts -- the two Gmail

3  accounts that they reference from two employees, so there are

4  e-mails that were produced that have those Gmail accounts on them,

5  or they have Gmail addresses.  That's true.  That's a fact.

6  Whether or not anybody ever spoke to these two employees who don't

7  work for my client anymore, and they haven't worked for them for

8  some time, to find out, you know, who directed them to create

9  these accounts, whether to use them for their employment, I don't

10 know, nobody has done that, at least not to my knowledge.  And the

11 plaintiffs haven't disclosed any information that they attempted

12 to contact these people.  I assume that they have their contact

13 information.  Maybe they haven't been able to find them yet.  I

14 haven't spoken to them.

15       But these are not official company accounts.  These were

16 not something that these employees were directed to create.  But

17 if we had access to those as well, if we had access to those and

18 we had the permission of whoever would be the owner of those

19 accounts, no issue with searching those as well.

20       We think that the scope of discovery in this case

21 relates to reports of prior violent crime that predate the

22 shooting.  We think that's discoverable.  There's no dispute about

23 that, we've never disputed that.  That's why we immediately agreed

24 to do the e-mail search.  So --

25       THE COURT:  Have y'all undertaken to find out who you

1  need to get permission from?

2          MR. PERNICIARO:  The individuals that are listed on

3  these accounts, I do not have contact information for them.

4          THE COURT:  I understand you don't have contact

5  information, but have y'all endeavored to get contact information?

6  I'm asking you.

7          MR. PERNICIARO:  Yes.

8          THE COURT:  You're --

9          MR. PERNICIARO:  Have we attempted to get contact

10 information for these individuals?  I think we have it now from

11 the employee files that were recently found, at least their last

12 known.  I would be happy to pick up the phone and call these

13 people after the hearing, your Honor.  Like I said, I just found

14 out about this, me personally, these employee files, last night,

15 and I haven't had a chance to talk to my client.

16         THE COURT:  I'll take your word for that.

17         Why were you so late -- why was your client so late in

18 giving you that information, I guess?

19         MR. PERNICIARO:  The additional employees, your Honor?

20         THE COURT:  Yeah.

21         MR. PERNICIARO:  I think -- and, like I said, I have not

22 had a chance to confer with them and find out this information,

23 but I suspect that they searched for the employees, like I asked

24 them to, and they found what they found.  And they searched a

25 different way recently in this other case that's filed in Gwinnett

```
1   County, and they found more employees.  I think that is the case.
2   I wouldn't be comfortable representing to the Court that is the
3   case but that's what my suspicion is what happened.
4        All I know is that they were asked to do something and
5   they produced the information which an employee swore was correct
6   to the best of their knowledge at the time.  It's in a verified
7   interrogatory response.  And if they misstated something
8   intentionally, then they did, but I don't have any reason to think
9   that they did.
10       So there's really not a lot of disagreement here.  It
11  seems like there is, but I think that that -- there's an
12  intention -- and no shade to plaintiffs' counsel here, but I feel
13  like there's a motive to try to make it seem like someone is
14  hiding because -- hiding information because it distracts from
15  some of the other legal issues in this case, which I would love to
16  get to eventually in this case, your Honor, some of the
17  dispositive motion issues and the legal issues about the actual
18  facts of the case.  And we're just hung up on these discovery
19  issues.  And, you know, that may be some fault of both of the
20  parties in failing to agree on certain things and failing to
21  cooperate.
22       I would like to mention that our preliminary joint
23  discovery plan required the parties to -- when they did determine
24  that the sources of ESI information were available that had
25  potentially discoverable information, they were to get together
```

```
 1  and come up with some sort of procedure to search that
 2  information.  And that gets back to what I originally started off
 3  by saying, with the keyword searches that we found out about with
 4  the motion to compel being filed.  So there was a failure between
 5  the parties to do what they needed to do essentially and come up
 6  with a plan awhile ago.
 7          But as far as who should -- or what should be produced,
 8  there are a set of original discovery requests that we received
 9  from the plaintiff.  The original requests for production, there
10  are -- and, I'm sorry, I'm turning away from the microphone.  I
11  just needed to get the correct piece of paper.  There are three
12  requests in their request for production that mentioned e-mails.
13          Number 14 referenced all text messages, e-mails, letters
14  and other correspondence between Eastwyck security personnel and
15  any of your other employees, agents or contractors.  And we
16  objected to that as being overbroad and not being proportional to
17  the needs of the case and as being irrelevant.
18          We agreed that we would produce security logs which are
19  prepared by the security employees as they do their rounds.  And
20  after that there was no -- there was no follow-up from plaintiffs'
21  counsel after we objected to that request for production.
22          Then there are two others that referenced various forms
23  of communication, including e-mails, but not only e-mails, text
24  messages, letters, other correspondence about the security gate at
25  the property.
```

1          So if -- I would like to give a little background

2 information because we've been talking a lot about discovery and

3 technical things, but this is a fairly large property.  It's about

4 40 acres.  It's in Decatur, Georgia.  And at the front of the

5 property there's a controlled access gate, you could call it that,

6 it electronically moves when a vehicle approaches.  And there's

7 been a contention in the lawsuit that it was broken and it somehow

8 related to the plaintiff decedent's death.  So we still haven't

9 found any communications that relate to the gate but that would be

10 something that we think is within the scope of discovery.

11          We've had a dispute about whether or not communications

12 after the subject incident involving the plaintiff decedent would

13 be within the scope of discovery.  So when you heard Mr. Rafi

14 talking about us withholding documents that were not privileged

15 but objecting to them, first of all, the hypothetical that he

16 gave is not something that I would ever do.  We would identify any

17 documents that we thought were not discoverable but they may not

18 be privileged and, you know, obviously give the plaintiff an

19 opportunity to try to explain why they think they are discoverable

20 and maybe we can work it out.  But the wholesale production method

21 we don't think is appropriate in this case.

22          So to do the e-mail search the way that we've agreed to

23 do it, at least in theory with the keywords we've agreed to, would

24 possibly result and very likely would result in finding many, many

25 e-mails that have nothing to do with any of the legal issues in

1   this case.  Some of the search terms are extremely broad.  Like
2   one of the search terms is G-A-B and an exclamation point, which
3   could be any version of that.  Safe.  Shoot.  Incident.  So these
4   can all relate to things that happened after Ms. Frazier's death,
5   which I think the Court would agree would not be discoverable
6   because they would not relate to any sort of notice to the client
7   of prior violent crime since this is a negligent security case.
8   So that's the basis for us wanting to have the opportunity to
9   preserve our objections that we made in our original discovery
10  responses, even if the documents are not privileged.  If the
11  e-mails are located, we think that there should be an opportunity
12  to --
13          THE COURT:  Well, I'm a little confused.  If they're not
14  privileged, why do you not want to turn them over?
15          MR. PERNICIARO:  Well, if they don't relate to anything,
16  they could --
17          THE COURT:  What?
18          MR. PERNICIARO:  Your Honor, if they don't relate to
19  anything in the case, they're not discoverable, they relate to --
20  maybe they relate to employment issues that happened after
21  Ms. Frazier's death, that doesn't have anything to do with whether
22  or not we were on notice of prior violent crime.
23          If they may relate to financial matters, they may relate
24  to other properties.  Some of these e-mail accounts we've agreed
25  to allow to be searched are of regional managers that manage other

```
 1  properties other than the one that we're talking about today, so I
 2  don't think those would be relevant to any of the legal issues in
 3  this case.
 4          THE COURT:  Well, it may not be relevant but it may be
 5  discoverable.
 6          MR. PERNICIARO:  It may be.
 7          THE COURT:  I'm not sure -- it would seem to me somehow
 8  the defendant's side of the case, you seem to keep -- just keep
 9  discovery going and embroiling all these little problems that just
10  shouldn't occur.
11          But let me ask -- well, I've got two or three things on
12  my mind.  One, I've thought about just appointing a special master
13  for the purposes of discovery if y'all are just going to keep on
14  and on.  And I can do that, but my first thought is probably the
15  plaintiff didn't have the resources to do that.  But if you do --
16          MR. RAFI:  So --
17          THE COURT:  I'm not going to make a magistrate.  We
18  haven't got enough magistrates to do all that.
19          MR. RAFI:  We would like to know what the cost would be,
20  although the lawyers on this side of the room, we bear the costs
21  ourselves of discovery and all expenses.  Ultimately that comes
22  out of our client's pocket at the end of the case, so --
23          THE COURT:  Well, using a special master is paid
24  50 percent by each side in these type situations.
25          MR. RAFI:  I don't have a good answer for you right now,
```

```
 1  Judge, but that is certainly something we thought about.  What our
 2  concern is, and I think you've hit it on the head here, is we keep
 3  going around and around.  I think we've obtained more information
 4  about the defendants ourselves from the Gwinnett County case than
 5  they've given us in this case.  And it's pretty scary that another
 6  law firm who represents the same defendant in that Gwinnett County
 7  case, that they found thousands and thousands of pages that that
 8  law firm hasn't.
 9          Our concern is that this may be a combination of things.
10  That it's a problem not only with the defendant, Contour
11  Companies, but it's a problem with the aggressiveness of their
12  counsel in trying to get this information.  The cycle we're stuck
13  in is that we asked the question and Mr. -- I can never say your
14  last name, I'm sorry.  Mr. Perniciaro.  I apologize.
15          MR. PERNICIARO:  It's Perniciaro.
16          MR. RAFI:  I'll never be able to say that in my whole
17  life, I apologize.
18          He's exactly right, he tells us something and we ask
19  13 questions back because it warrants 13 questions.  And we get an
20  answer that we think is true, we're told this is the answer.  And
21  then two weeks, two months, six months later we're told, well, we
22  didn't know that.
23          What you heard just a few minutes ago, your Honor, about
24  this electronic discovery, this ESI stuff, is that the corporate
25  representative should be forgiven because she's not a technical
```

1   person.  Well, the 30(b)(6) notice listed --

2           THE COURT:  Wait a minute.  I don't need to get down in

3   the weeds that far.

4           Tell me -- I really haven't seen in all your filings a

5   good reason -- the defendants are willing to pay for this expert.

6   What's their name?

7           MR. PERNICIARO:  Relevant Data, your Honor.

8           THE COURT:  But I really haven't heard a good reason why

9   we shouldn't let the defendant pay for that expert and let them do

10  them, the forensic.

11          MR. RAFI:  We think the defendant should pay for it, we

12  just don't think they should use that expert.  And the reason for

13  that is --

14          THE COURT:  I'm asking you why not that expert if

15  they're willing to pay for that expert and I don't have to get

16  involved in who pays what and pay it into the court and

17  blah-blah-blah?

18          MR. RAFI:  Our issue with that expert is that we have

19  concerns that the expert who has worked for the defendant in this

20  case is not neutral.  The defendant has been already hired and

21  retained by -- excuse me.  The expert has already been hired and

22  retained by the defendant previously in the case.  It's

23  defendant's expert.

24          THE COURT:  Something about searching a cell phone?

25          MR. RAFI:  Yes, your Honor.

 1          MR. PERNICIARO:  I'm sorry, go ahead.  I had something
 2  to say, but I'll be happy to let him finish.
 3          THE COURT:  You're going to have to get close to the
 4  microphone.
 5          MR. PERNICIARO:  I'm sorry, your Honor.  I really do
 6  apologize.  We discussed using Relevant Data with plaintiffs'
 7  counsel after they asked us to use them.  And I proposed that they
 8  be made available and accessible to them if they want to ask them
 9  questions about how they did the search.
10          They keep mentioning that he's our expert, he's our
11  expert, but I would be happy to turn over all my communications
12  that I've had with them so far electronically.  We didn't use him
13  in any advocacy manner, he just downloaded the cell phone.
14          THE COURT:  Let me get back to the plaintiff.
15          Other than they've hired them before, is there any other
16  reason I shouldn't consider those people?
17          MR. RAFI:  No, your Honor.  The only reason is that he's
18  been already retained by the defendant in a separate issue in this
19  case.
20          THE COURT:  Okay.
21          MR. RAFI:  What we fear is that step one is what are all
22  the e-mail accounts.  Step two is can we search them.  And step
23  three is performing the search.  We're focused on step three right
24  now.  The problem we're having with 62 new -- excuse me, 42 new
25  employees for 62 total is that there's a whole lot of accounts

```
 1   that we don't know about.  And what if that expert goes into the
 2   GoDaddy account and says, for example, Bradley Payne, who we
 3   discussed earlier, that former manager that Contour told us worked
 4   at the property at the time of the shooting when he really didn't,
 5   Bradley Payne's e-mail account is supposedly deleted.  The only
 6   way we believe that is because Contour has told us that.  If the
 7   expert goes in there and sees e-mails from Bradley Payne's
 8   account, what does he do?  What does he do?  He's hired by the
 9   defense, he has an allegiance to the defense.  We're concerned he
10   doesn't tell everyone, hey, you all thought that Bradley Payne's
11   e-mails were deleted, they're still there.  That's our concern.
12   We want someone completely neutral who is going to speak up.  And
13   if, Judge, you tell the expert do the right thing, we believe
14   that.
15           THE COURT:  If we use Relevant, how long will it take
16   this expert to perform the duties you want him to?
17           MR. PERNICIARO:  I have four e-mail accounts that have
18   been identified that are GoDaddy accounts that are ready to go.
19   And I don't think it will take longer than a week.
20           THE COURT:  How long will it take this expert to do what
21   he needs to be charged with?
22           MR. PERNICIARO:  I don't think longer than a week.
23           THE COURT:  How long?
24           MR. PERNICIARO:  I don't think longer than a week for
25   him --
```

```
 1              THE COURT:  A week?

 2              MR. PERNICIARO:  -- to export all the e-mails.  And

 3    then, obviously, I would need to go through them for privileged

 4    information because I've communicated with a lot of these people

 5    through e-mails.

 6              MR. RAFI:  Your Honor, if I may say two things.  The

 7    first thing is that if we're only searching four e-mails, we're

 8    going to need to do this again and again.  There's 62 folks.  We

 9    need to find -- we don't know what e-mails exist, what e-mails

10    don't.  What was just represented to the Court is that only

11    managers have e-mails.  Here's two leasing office employees with

12    e-mails, that's tab three in the binder.  So there's more e-mails

13    than just managers.

14              The second thing is that the scope, the date scope, the

15    date range of the e-mails should be through now.  The idea that

16    e-mails don't necessarily -- they talk about things that happen

17    before.

18              THE COURT:  Well, I'll agree that it ought to go past

19    the death of this woman.

20              MR. RAFI:  We got an e-mail that says -- that talks

21    about -- that was months after the shooting that talks about the

22    security guard having sex with a minor in a car, a tenant's

23    reporting that.  And that the -- then the tenant also said in the

24    e-mail that the security guard wasn't reporting when there were

25    gunshots.  That e-mail was after the shooting and it obviously
```

1 relates back to before.  So I appreciate the Court's willingness
2 to go past the day of the death.

3       THE COURT:  Well, I'm thinking that your expert is going
4 to need more than a week to do the examination I'm thinking about.
5 I don't know whether I'm taking a month, two months, three months.
6 Three months is sort of my maximum period.  Let me get on to it.

7       What I'm thinking about doing, if you fellas want to pay
8 it, we'll use that expert, get a report from that expert, examine
9 it and see whether we need to have a second expert.  But that's so
10 inviting to use that expert and they're willing to pay for the
11 whole thing and I won't have to slip off into that argument and
12 mess.

13       MR. RAFI:  Our concern, your Honor, is not the expert's
14 qualifications, it's the expert's judgment in those first two
15 parts of this analysis, which are what are the accounts and what
16 can he access.  If we can solve those two --

17       THE COURT:  Surely if we use this expert, you're going
18 to know more when he gets through than you know now.

19       MR. RAFI:  I agree, your Honor.  I think that's a very
20 good point.

21       THE COURT:  And you might want to pay the entire cost of
22 the second expert to go further.

23       MR. RAFI:  The history of these e-mails are that we've
24 been given multiple productions of e-mails after Contour's
25 self-run searches, and those e-mails should have been produced a

```
 1  long time ago.  Our biggest concern is still that we're not going
 2  to search the right e-mail accounts, or that we're going to think
 3  that we can't search an e-mail account that really does exist.
 4            THE COURT:  Well, I'm not sure how we're going to
 5  resolve that today.
 6            MR. RAFI:  I think the answer is, your Honor, that there
 7  needs to be an order that whoever the expert is, if it's
 8  defendant's expert, that's fine, but needs to go through the
 9  GoDaddy account which -- and find out the things like licenses,
10  aliases is what GoDaddy calls it, accounts, licenses, aliases and
11  account changes, and then we have all the information and then we
12  can decide what to search and what needs to be searched and what
13  doesn't.
14            That's why we're at step three, the search.  And I
15  apologize, your Honor, I keep going back to step one and two,
16  which is who are the employees and what are their e-mail accounts.
17  We don't know step one and step two, so we want to do this as
18  efficiently as possible, but we certainly want to know more than
19  we know now, your Honor.  We feel like we know a very small amount
20  of what's out there.  We certainly know less than those folks in
21  Gwinnett.  And I guess up until yesterday we knew more than
22  defense counsel.  We knew about the 62 employees and he didn't,
23  which is a scary proposition that defense counsel -- defendant
24  didn't share with their own defense counsel information that we
25  learned from another case.  That's how this case is going and
```

 1  that's a scary thing in the interest of justice.

 2            THE COURT:  Well, let me ask defense counsel.  I'm a

 3  little -- sometimes I'm getting lost down in the weeds, but my

 4  understanding was that y'all claimed there was only one Gmail

 5  account used by the leasing offices.  But then the plaintiffs'

 6  brief points out on April 30th, 2019, an e-mail got produced by

 7  the defendants from jennifer.eastwyck@gmail.com.  How do you

 8  explain that if there's only one account?

 9            MR. PERNICIARO:  I think the explanation for that, your

10  Honor, is -- and we were talking about this earlier, that none of

11  us has spoken to those two employees, and I have not spoken to

12  them.  I think that these employees decided on their own to create

13  their own Gmail accounts and start using them as part of their

14  jobs, but they were not the leasing office account that my client

15  was aware of.

16            Now, there was an e-mail that was produced that mentions

17  the two accounts that your Honor just mentioned that was forwarded

18  to an employee, a manager, Latasha Dia.  Whether or not she

19  recalls getting that e-mail or not is another matter.  So --

20            THE COURT:  Well --

21            MR. PERNICIARO:  We would be happy -- like I said

22  earlier --

23            THE COURT:  Well --

24            MR. PERNICIARO:  I'm sorry.

25            THE COURT:  -- I don't pretend to even be an amateur at

1  this, but I've got employees and they create their own e-mail

2  accounts with Gmail or whoever they do it with, but they don't use

3  US Courts in it like Eastwyck in this particular address.  So if

4  you've got employees out there creating their own accounts and

5  they use Eastwyck --

6          MR. RAFI:  Judge, we have spoken to these employees, we

7  have spoken to them.  These employees were not disclosed on

8  Thursday.  We've known about them for six months and so has

9  defense counsel.  We've spoken to these employees and they say

10 that they were instructed by their managers to create these

11 accounts.

12         THE COURT:  I'm sorry?

13         MR. RAFI:  That they were instructed by their

14 managers to create this account, which is why it has, dot,

15 eastwyck@gmail.com.

16         MR. PERNICIARO:  And my clients may dispute that, I

17 don't know.  I haven't spoken to those people.  But if they were

18 already disclosed, maybe they were, I may have misspoken earlier.

19 I don't have the interrogatory responses in front of me.

20         THE COURT:  If you said anything important, I didn't

21 hear it.  You turned away from the microphone part of the time,

22 and I'm a little hard of hearing, I'll be honest with you.

23         MR. PERNICIARO:  I'll repeat myself, your Honor.  I said

24 that those employees were previously disclosed according to

25 plaintiffs' counsel in our discovery responses with their contact

1   information, which I assume is how they spoke with them.

2          THE COURT:  Well, I don't think the issue is whether you

3   disclosed the employees, the issue is whether you've given them

4   misinformation about the accounts.

5          MR. PERNICIARO:  Well, my client has said -- and I --

6   this is -- they're referencing conversations.  I don't know if

7   there's any affidavits or testimony to support what they've said

8   about these employees being directed to create these accounts.

9   That may be a disputed issue of fact, I don't know.  But my client

10  has told me that there was a leasing office account, which is

11  the -- I keep forgetting the e-mail address, but we mentioned it

12  earlier.

13         THE COURT:  All right.  Well, I think I --

14         MR. RAFI:  Judge, may I make one more statement?

15         It was said earlier this is a mom and pop shop, that

16  this is a self-run business owned by a family, and that's true.

17  It's a family who owns tens of millions of dollars of property in

18  multiple states.  And it's a company, the defendant is, who has an

19  outside IT company.  They have an outside IT company.  I'm going

20  to repeat that one more time.  They have an outside IT company

21  that is still employed by them.  And this defendant in this case

22  has never told us that.  We learned about that today from the

23  Gwinnett County case.  The company's name is Cigna (phonetic)

24  Systems.  So this mom and pop store that's struggling to

25  apparently find e-mails and know what accounts there are has an

```
 1   outside IT company that's never been disclosed.  So I encourage
 2   the Court to consider that when we're talking about a mom and pop
 3   shop that owns hundreds of millions of dollars of real estate
 4   across this country.
 5               THE COURT:  Okay.
 6               MR. RAFI:  Thank you for your time, Judge.
 7               THE COURT:  Well, let me just say this, this isn't
 8   exactly the first time this has come up, of problems in discovery
 9   and allegations about them hiding things.  The last case I had, I
10   guess, where we had all this was DaVita.  DaVita had a good case
11   to defend.  They cheated in discovery.  It cost them $500 Million.
12   They settled it for $500 Million because King & Spalding was
13   absolutely convinced that I was getting ready to strike the answer
14   and proceed on damages only.
15               I had another case where Lockheed was giving their
16   attorneys, very good attorneys, information but not everything.
17   And they got a -- they got a defendant's verdict in the trial.
18   The Rowe's law firm in Dallas went back out there and started
19   looking in another case Lockheed was in in Texas and found
20   contrary answers out there, so there was a new trial granted.
21               And Lockheed, I guess, thought they were going to get
22   home cooking while they were down here.  Well, they got cooked.
23   They had to pay to finally settle the case.
24               Judge Vining had a wonderful case, years ago, a BIC
25   Lighter blew up and burned a child.  The lawyers out of Florida
```

```
 1   assured him of certain things in discovery that they did not
 2   exist, absolutely did not exist.  Plaintiff's lawyer kept trying
 3   to get it, said they've got to exist.  Oh, no, they don't exist.
 4          A judge in Virginia sent Vining information by BIC
 5   Lighter where what they were saying down here didn't exist did
 6   exist and had been filed in Virginia.  The same lawyers filed in
 7   Virginia the information that was sought here and represented to
 8   the Court that it didn't exist.  Vining blew his top, dismissed
 9   the answer and let them start proceeding on damages only.  That
10   settled I think for 3 Million.
11          You need to warn your client we're going to try one
12   more round and after that we're going to start looking at real
13   sanctions.  And the ultimate sanction is to dismiss the answer and
14   let them proceed with damages.  And I have done it.  But then when
15   I got ready to do it, they ran out in the hall and settled it for
16   millions.
17          And the DaVita case was really unbelievable to me
18   because they had a wonderful defense but they just -- that company
19   absolutely could not help themselves, they had to cheat.  And as a
20   result of all that, we've got Lin Wood who made a fortune out of
21   that case and now I have to read about him all the time.
22          All right.  I think --
23          MR. PERNICIARO:  Can I just say one thing?
24          THE COURT:  Yes.
25          MR. PERNICIARO:  Do you mind?
```

```
1            I have never been before you before and it's been a

2  pleasure.  I will certainly impress your words to the "T" the best

3  I can remember them to my client.  And I hope that, you know, we

4  don't have to be back in front of you again on another discovery

5  matter.  I'll do everything I can to prevent that from happening.

6            THE COURT:  All right, sir.  Thank you.

7            MR. RAFI:  Thank you, Judge.

8            THE COURT:  Get an order for me.

9            (PROCEEDINGS REPORTED WERE CONCLUDED 3:19 P.M.)

10                    _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES DISTRICT COURT

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6       I do hereby certify that the foregoing pages are a true and

 7   correct transcript of the proceedings taken down by me in the case

 8   aforesaid.

 9       This the 22nd day of December, 2021.

10

11

12

13

14       _____

15                    PENNY PRITTY COUDRIET, RMR, CRR
                       OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```