In The Matter Of:
# Collins-Williams vs. Contour Eastwyck

Deposition Of:
## 30(b)(6) Nora Prekelezaj

Taken On:
### 4/16/2021

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



EXPERIENCED · PROFESSIONAL · DEPENDABLE

Collins-Williams vs. Contour Eastwyck  30(b)(6) Nora Prekelezaj  4/16/2021

Page 117

1 that have been placed in their tenant file?
2   A   Correct, should they have sat down and
3 filled out the incident report with management.
4   Q   Did Contour have any sort of electronic, I
5 don't know, reporting system, or was there ever
6 anything filled out on the computer regarding
7 incidents at the property?
8   A   Are you referencing a database or just a
9 form?
10  Q   We -- we'll take -- we'll go one by one.
11 Database?
12  A   No.
13  Q   What about a form?
14  A   It's possible they could have filled out the
15 form on the computer. It is a -- it's just a Word
16 document, so...
17  Q   Okay. Was there anything that would have
18 been -- are there any other -- I'm trying just to
19 figure out if there's any, what about any sort of
20 emails or anything like that?
21  A   No.
22  Q   If a tenant made a complaint about crime on
23 the property, I know you mentioned that there is --
24 there would have needed to be an incident report
25 filled out, and I believe that would have been done by

Page 118

1 the leasing office employees; right?
2   A   Correct.
3   Q   Okay. Did Contour Eastwyck employees have
4 email addresses?
5   A   Not all of them, but, yes, there were some
6 with email addresses.
7   Q   Okay. What is the -- I guess what's the
8 distinction between who gets an email address and who
9 doesn't?
10  A   The property manager has an email address
11 and then leasing employees usually share one email
12 between all employees that are leasing.
13  Q   Okay. What was the -- was there a specific,
14 I guess, specific email account that they shared?
15  A   Yes. I just don't know it off the top of my
16 head.
17  Q   Okay. And what is the format of -- you said
18 leasing managers would have emails. What's the, like,
19 is it something @ContourEastwyck.com or what were
20 their, what's the email format?
21  A   It's typically first name
22 @ContourCompanies.com.
23  Q   Okay.
24  A   But depending on what the first name is,
25 obviously if there's a similar first name within the

Page 119

1 email database, it would be a different format.
2   Q   Okay. And if a -- if tenants were to --
3       Tenants had the leasing office's email,
4 right, I presume?
5   A   I don't know if they did. It's possible.
6   Q   If a tenant had emailed any employee at
7 Contour Eastwyck about, you know, crime, criminal
8 activity, anything like that, would that email have
9 been saved in their tenant file?
10  A   No. They would have to come into the
11 leasing office and create an incident report with a
12 leasing agent or manager or somebody in the office.
13  Q   If a tenant had complained about crime via
14 email to a Contour Eastwyck employee, what is
15 Contour's policy on retention of emails?
16  A   We don't have a policy on retention of
17 emails. If a tenant were to have complained, they
18 would have been directed to come into the leasing
19 office to create an official incident report.
20  Q   Okay. I understand that but I'm trying to
21 figure out if, you know, if there was an initial email
22 to them, you know, that, say, somebody emailed -- I'm
23 just curious what happens when someone emails someone
24 at Contour Eastwyck. Are those emails backed up?
25  A   They're backed up on our database, correct,

Page 120

1 on our domain database.
2   Q   Your what?
3   A   Our domain database.
4   Q   Okay. And who -- do you know who -- what
5 type of database it is, what type of server,
6 everything?
7   A   No, no.
8   Q   Who's your IT person?
9   A   We have an IT in-house --
10  Q   Okay. What's the name --
11  A   -- currently.
12  Q   Well, at the -- what about at the time did
13 you have --
14  A   At the time we didn't have anybody in-house.
15  Q   Okay. Who is the IT person now?
16  A   His name is Edward.
17  Q   Okay. But at the time -- well, let me ask
18 you. So from the time that Contour bought the
19 Eastwyck property back at the end of 2017 up until the
20 president -- not president -- present, Contour has
21 had, you've had an email retention policy; correct?
22  A   No. We do not have an email retention
23 policy.
24  Q   Have the emails always been backed up?
25  A   They are, yes, backed up on the database.

## Page 1

```
IN THE STATE COURT OF GWINNETT COUNTY
            STATE OF GEORGIA

SHANIQUE MAYES, Individually
And as Next of Kin, and
Natural Parent on behalf of
MCKENZIE MAYES, a minor,
    Plaintiff,
                              CIVIL ACTION FILE
vs.                           NO.:20-C-04895-S2
CONTOUR EASTWYCK, LLC,
    Defendant.
------------------------------

        REMOTE 30(b)(6) DEPOSITION OF
         CONTOUR EASTWYCK, LLC through
                NORA PREKELEZAJ
                 July 23, 2021
                  11:02 a.m.
      (All attendees appeared remotely via
   Videoconferencing and/or teleconferencing.)
          Jessika Highers, CCR, CER-1118
               6016-3919-6137-8816
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2  On behalf of the Plaintiff:
 3     GARY BERNARD ANDREWS, Esquire
       The Cochran Firm
 4     100 Peachtree Street, NW
       Suite 2600
 5     Atlanta, Georgia 30303
       (404) 222-9922
 6     gandrews@cochranfirmatl.com
 7  On behalf of the Defendant:
 8     DOMINKO C. RUMPH, Esquire
       Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP
 9     Meridian II
       275 Scientific Drive
10     Suite 2000
       Peachtree Corners, Georgia 30092
11     (404) 881-2636
       drumph@cmlawfirm.com
```

## Page 3

| | | | Page |
|---|---|---|---|
| 1 | | INDEX TO EXAMINATIONS | |
| 2 | WITNESS: NORA PREKELEZAJ | | |
| 3 | EXAMINATION | | Page |
| 4 | By Mr. Andrews | | 5 |
| 6 | | INDEX TO EXHIBITS | |
| 7 | Exhibit | Description | Page |
| 8 | P-1 | Notice | 16 |
| 9 | P-2 | Defendant's Responses to RFAs | 39 |
| 10 | P-3 | Defendant's Responses to the Interrogatories | 39 |
| 12 | P-4 | Defendant's Responses to RPD | 39 |
| 13 | P-5 | Defendant's First Supplement Responses to Interogs | 39 |
| 15 | P-6 | 30(b)(6) -- Verification | 39 |
| 16 | P-7 | Preservation Letter | 66 |
| 18 | P-9 | Courtesy Logs BS00198 to BS000511 | 98 |
| 20 | P-10 | BS000218 v BS000481 | 102 |
| 21 | P-10-1 | BS000219 v BS000482 | 102 |
| 22 | P-10-2 | BS000220 v BS000483 | 102 |
| 23 | P-10-3 | BS000221 v BS000484 | 102 |
| 24 | P-10-4 | BS000222 v BS000485 | 102 |
| 25 | P-10-5 | BS000223 v BS000486 | 102 |

## Page 4

| | INDEX TO EXHIBITS | | |
|---|---|---|---|
| | Exhibit | Description | Page |
| 3 | P-10-6 | BS000224 v BS000487 | 102 |
| 4 | P-10-7 | BS000225 v BS000488 | 102 |
| 5 | P-10-8 | BS000226 v BS000489 | 102 |
| 6 | P-10-9 | BS000227 v BS000490 | 102 |
| 7 | P-10-10 | BS000228 v BS000491 | 102 |
| 8 | P-11 | Police Reports | 117 |
| 9 | P-12 | Employee File K. Thurman | 76 |
| 10 | P-13 | Employee File R. Eskridge | 76 |
| 11 | P-14 | Separation Notice G. Witt | 76 |
| 12 | P-15 | Employee File B. Payne | 76 |
| 13 | P-16 | Employee File M. Rhodes | 76 |
| 14 | P-17 | Employee File D. Pauleon | 76 |
| 15 | P-18 | Plaintiff's Brief for MTC | 128 |
| 16 | P-19 | Defendant's Response to MTC | 128 |
| 17 | P-20 | Defendant's Response to MTC, email | 128 |
| 18 | P-21 | Order | 128 |
| 19 | P-22 | Defendant Emails | 128 |
| 20 | P-23 | Defendant's Response to Motion to Compel | 128 |
| 22 | P-24 | Employee List | 33 |
| 23 | (Original Exhibits Retained by Counsel Andrews.) | | |



Page 137

1  MR. RUMPH: And you can go -- you could answer
2  to the extent that -- you can answer.
3  THE WITNESS: Nothing was produced.
4  BY MR. ANDREWS:
5  Q.  Thank you. All right. Do you have an in-
6  house IT person?
7  A.  We do not.
8  Q.  Let me ask this: At any -- from 2017, while
9  you owned the property, if you had anyone doing in-house
10 IT?
11 A.  Employed from Contour?
12 Q.  Third-party, just doing internet -- did you
13 have anyone employed?
14 A.  Yes, there was a third-party that we subbed
15 our IT work to.
16 Q.  And who was that third-party?
17 A.  Cygnus Systems.
18 Q.  And how long had they been employed by Contour
19 Eastwyck?
20 A.  Specifically, by Contour Eastwyck, they were
21 not employed.
22 Q.  I'm sorry. By Contour Development Group. I
23 apologize.
24 A.  So, they weren't employed by Contour
25 Development Group, but they performed any IT tasks we

Page 138

1  needed through scopes of work, and under any, kind of,
2  contract or requested work from them.
3  Q.  Starting when? When did the -- when -- when
4  did you engage them?
5  A.  Sometime in 2016.
6  Q.  Sometime in 2016?
7  A.  Yeah.
8  Q.  Do you still currently use this firm?
9  A.  We do.
10 Q.  And -- and -- and -- and using this firm, are
11 they the one who maintains your -- your system?
12 A.  In regards to what?
13 Q.  In regards to your internet and -- and email
14 system, storing, keeping -- backing up your email
15 system?
16 A.  Our emails aren't backed up. We use GoDaddy
17 as our domain provider. So, our -- our emails are --
18 they're not stored anywhere or backed up anywhere.
19 Q.  Okay.
20 MR. ANDREWS: All right. We may be finishing
21 up. Dominiko, give me about five minutes then I
22 may be finishing up, sir.
23 MR. RUMPH: All right.
24 [OFF THE RECORD]
25 MR. ANDREWS: All right. Madam Court

Page 139

1  Reporter, if you would put back up Exhibit Number
2  4. And we're looking at 32.
3  COURT REPORTER: That's 5. There's 4, 32.
4  BY MR. ANDREWS:
5  Q.  Okay. Ms. Nora, we asked regarding all work
6  orders, maintenance requests, and other documents
7  reflecting repairs or upgrades to the property,
8  installation of lots, security, fencing. You testified
9  earlier that the gate wasn't working properly; correct?
10 A.  Correct.
11 Q.  Did you -- did Contour Eastwyck not get any
12 repair request to repair the gate?
13 A.  From tenants?
14 Q.  No, no, no. The gate wasn't functional. It
15 wasn't working; correct?
16 A.  Correct.
17 Q.  My question is: Did Contour Eastwyck not get
18 any requests for service to potentially get the gate
19 repaired -- any work order requests to repair the gate?
20 A.  There was quotes for repairing the gate;
21 correct.
22 Q.  And let me just -- and -- and -- and I need to
23 -- I can look at them. I know it seems like there was
24 quotes to install new gates on the property, but my
25 question deals with, were there quotes to repair the

Page 140

1  current gate or was those quotes to -- only done to just
2  get the gate -- to just put a new gate in? Do you
3  understand my question?
4  A.  I do. There were just quotes to replace the
5  gate, none to repair the -- the system that was there.
6  Q.  Okay. So, Contour Eastwyck did not look into
7  getting that gate repaired. They were just going to
8  replace it; is that fair to say?
9  A.  That is correct.
10 MR. ANDREWS: Okay. All right. No further
11 questions.
12 MR. RUMPH: I don't have any questions.
13 MR. ANDREWS: Okay. All right. Thank you,
14 Ms. Nora, for your time.
15 MR. ANDREWS: Sure.
16 COURT REPORTER: She mentioned in-house
17 counsel, and I didn't catch the name clearly. If
18 you could repeat it for me?
19 MR. RUMPH: Paul Bargamian.
20 COURT REPORTER: And is that going to be
21 Michigan Bar?
22 MR. RUMPH: I have no clue where Paul was
23 licensed. He was probably licensed --
24 THE WITNESS: I -- I -- Michigan.
25 MR. RUMPH: Is it only Michigan?